# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No.: 1:22-cr-34 (RBW)** |
| **v.** | : | |
| | : | |
| **AIDEN HENRY BILYARD** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum. For the reasons set forth below, the Government requests that this Court sentence Aiden Henry Bilyard to a term of 47 months of incarceration, at the low end of the applicable advisory Sentencing Guidelines range of 46 to 57 months, plus three years of supervised release, $3,500 in restitution, and the mandatory $100 special assessment.

## I.       INTRODUCTION

Aiden Henry Bilyard violently attacked the United States Capitol on January 6, 2021 by pepper spraying a line of Metropolitan Police Department ("MPD") officers defending the Capitol Building and by using a metal bat to break into and enter a Capitol conference room. He thus served as a critical member of the mob that used violence to interrupt the certification of the 2020 Electoral College vote count, threaten the peaceful transfer of power after the 2020 Presidential election, and injure more than one hundred police officers, resulting in more than 2.8 million dollars in losses.[1]

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United

Bilyard, then a student, attended the "Stop the Steal" rally and then proceeded to restricted Capitol Grounds, specifically, the Lower West Terrace ("LWT"), a particularly violent area during the riot.  While at the LWT, Bilyard stood toward the front of a crowd of rioters and discharged "home defense pepper gel" (a chemical irritant more potent that pepper spray) at a line of uniformed MPD officers and then Bilyard followed those officers when they retreated to the LWT tunnel.  Bilyard witnessed some of the most violent assaults on law enforcement officers at the Capitol during his time outside of the LWT tunnel.  After approximately an hour and a half standing amidst the intense violence and chaos outside the LWT tunnel, and instead of leaving the Capitol, Bilyard used a metal bat to shatter the lower glass portion of a window into the U.S. Capitol Building, encouraged other rioters to crawl through and enter the building using the breach point he created, and was the first rioter to crawl through the window into a Capitol conference room.  He then remained in the Capitol Building for at least 16 minutes, taking photos and videos while inside.  Immediately after the riot, Bilyard showed no remorse.  When his mother contacted him after he brought back a canister of pepper gel from the riot, he joked in a text message that he "[h]ad to bring something back."  He also lied to FBI agents during an August 2021 interview, claiming that he only participated in lawful activities while at the Capitol.

The Government recommends that the Court sentence Bilyard to 47 months of incarceration, which is at the low end of the applicable advisory Guidelines' range of 46 to 57 months.  A 47-month sentence reflects the gravity of Bilyard's conduct and meets the needs of general and specific deterrence, but also credits his early acceptance of responsibility and his cooperation with the Government.

---

States Capitol building and grounds and certain costs borne by the United States Capitol Police.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol[2]

On January 6, 2021, hundreds of rioters attacked the U.S. Capitol in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election. Many rioters attacked and injured police officers, sometimes with dangerous weapons; they terrified congressional staff and others on scene that day, many of whom fled for their safety; and they ransacked the historic building—vandalizing, damaging, and stealing artwork, furniture, and other property.

### B.     Bilyard's Role in the January 6, 2021 Attack on the Capitol

Bilyard traveled from Cary, North Carolina to Washington, D.C. during the early morning hours of January 6, 2021, in order to attend the "Stop the Steal" rally at the Capitol Ellipse and protest Congress's certification of the Electoral College votes.  He then marched with other protestors to the Capitol.

### Assault on Law Enforcement Officers at the Lower West Terrace

Bilyard and others assembled on the restricted grounds of the West Plaza around a group of uniformed officers who had retreated and regrouped in order to defend the Capitol Building. By around 2:00 p.m., those rioters shouted at the officers and assaulted them while attempting to proceed further into the restricted Capitol grounds and, eventually, breach the United States Capitol Building.

Bilyard then moved from the West Plaza to the LWT.  Body-worn camera footage of MPD Officer L.H., a static screenshot of which is shown below, revealed Bilyard, wearing grey

---

[2] To avoid unnecessary repetition, the Government refers the court to a brief summary of the attack on the United States Capitol as set forth in ¶¶ 1-7 of the Statement of Offense in this case, ECF No. 39.

sweatpants, a black "puffer" style jacket, and a disposable light blue face mask over his mouth, at the front of the crowd of rioters at the LWT.  At approximately 2:35 p.m., Bilyard can be seen standing among the mob in a restricted area, holding what appears to be a large gold-colored canister.



Figure 1 (Still image from body-worn camera footage contained in Exhibit 1 at 0:06)

A portion of Officer L.H.'s body-worn camera footage, Exhibit 1, then shows Bilyard pointing the nozzle of the canister toward a line of uniformed law enforcement officers from the MPD and activating the propellant, discharging an orange-colored liquid spray against the group of officers.


Figure 2 (still image from body-worn camera footage contained in Exhibit 1 at 0:07)

The images included below, obtained through open-source video taken on January 6, 2021 (Exhibits 2 and 3), show the same incident from behind Bilyard as he and other encroaching rioters faced the defensive line of officers:


Figure 3 (still image from open-source video footage contained in Exhibit 2 at 0:07)

5



Figure 4 (still image from open-source video footage contained in Exhibit 2 at 0:06)

As discussed further below, the substance Bilyard sprayed at officers was "Home Defense Pepper Gel."  Pepper gel is a chemical irritant that contains a concentration of the active ingredient capsaicin and is used in self-defense products.  Pepper gel is thicker, easier to aim accurately, less likely to blow back onto the individual dispersing it, and is more potent than pepper spray.  "Pepper spray not only has the potential to cause physical injury, but that is the very point of the device: It is "*designed* to cause intense pain.'"  *United States v. Mosley*, 635 F.3d 859, 862 (6th Cir. 2011) (emphasis in original) (quoting *Headwaters Forest Def. v. Cnty. of Humboldt*, 240 F.3d 1185, 1199 (9th Cir. 2000), *vacated on other grounds by* 534 U.S. 801 (2001)).

MPD Officer L.H. was interviewed about the incident that took place at the LWT at approximately 2:35 p.m.  L.H. also was shown excerpts of the video created by his body-worn camera, contained in Exhibit 1.  L.H. recalled being assaulted with chemical spray on multiple occasions on January 6, 2021.  Through his training and experience, L.H. instantly recognized the orange substance as a capsaicin-based product but described it as being far stronger than any

chemical munition he had previously been exposed to.  L.H.'s exposure to chemical spray on January 6, 2021 caused him extreme pain and incapacitated him.  This incapacitation prevented him from carrying out his law enforcement duties.  L.H. stated he was sprayed multiple times on January 6, 2021 by multiple individuals before ultimately retreating from the rioters to recover and decontaminate.  He could not definitively state whether he was struck by the pepper gel discharged by Bilyard.  Immediately after Bilyard sprayed the chemical agent, officers that remained in the LWT retreated through a stairwell to the LWT tunnel.

### Conduct Near the Tunnel and Inaugural Stage

Bilyard took the same set of stairs towards the LWT tunnel as the retreating officers.  It was from that location that Bilyard observed the intense fighting between law enforcement and rioters.  The LWT and its attendant tunnel entrance were the site of some of the most brutal and violent attacks on police that day.  The entrance usually consists of a flight of stairs leading to a doorway.  On January 6, 2021, however, the construction of the inaugural stage converted the stairway into a 10-foot-wide, slightly sloped, short tunnel that was approximately 15 feet long (the "Tunnel").  The Tunnel led to two sets of metal swinging doors inset with glass.  On the other side of the two sets of swinging doors is a security screening area with metal detectors and an x-ray scanner and belt, that leads into the basement of the Capitol Building.  The exterior of the Tunnel is framed by a stone archway that is a visual focal point at the center of the West Front of the Capitol Building.  It is circled in red below.  Room ST-2M, the conference room that Bilyard later breached, is identified by a yellow circle.



Figure 5 (photograph from a prior presidential inauguration)

On January 6, 2021, when rioters arrived at the doors behind this archway, the outer set of doors was closed and locked, and members of Congress who had fled from the rioters were sheltering nearby.  Members of the Capitol Police, assisted by officers from the MPD, were arrayed inside the doorway to guard the entrance.  Many of the officers had already engaged with the mob for over an hour, having established a defense line here after retreating from the West Plaza below.

At approximately 2:42 p.m., the mob broke the windows to the first set of doors, and the law enforcement officers reacted immediately by spraying Oleoresin Capsicum ("OC") spray at the rioters, who continued to resist.  The mob continued to grow, and the rioters pushed their way into the second set of doors, physically engaging officers with batons, poles, chemical spray, bottles and other items.  Officers created a line in the doorway to block the rioters and engaged them with batons and OC spray.

8

The violent and physical battle for control over the LWT entrance in the Tunnel and doorway area continued for over two hours, during which time rioters repeatedly assaulted, threatened, pushed, and beat law enforcement officers.  The battle for the LWT entrance involved intense hand-to-hand combat, and some of the most violent acts against law enforcement, including the abduction and tasering of MPD Officer Michael Fanone at approximately 3:16 p.m., and the assault of Officer Daniel Hodges.  During this battle, the vastly outnumbered officers were assaulted with all manner of objects and weapons, receiving blow after blow from rioters taking turns assaulting them, all in a concerted effort to breach the doorway to the basement area of the Capitol, disrupt the certification, and overturn the election results by force.  Several officers sustained injuries during this prolonged struggle, and many returned to defend the Capitol, even when injured, as substantial reinforcements for these officers did not arrive until heavily armored Virginia State Police officers joined the police line with additional munitions around 5:00 p.m.

A video that Bilyard recorded at 3:55 p.m. from just outside the Tunnel shows the rioters stealing a police shield as the crowd chants, "pull them out!"



Figure 6 (still image from Bilyard's cell phone footage contained in Exhibit 4 at 0:06)

Bilyard can be seen in open-source videos as he observes the mob's violent assault on uniformed officers at the same location.



Figure 7 (still image from open-source video footage found at
https://www.youtube.com/watch?v=MoBTO6NKuLY&t=10774s at 2:34.42)

**Bilyard Breaks a Window to the Capitol and Unlawfully Enters**

At around 4:10 p.m., Bilyard was still standing with the large crowd of people who gathered in front of a large glass window of the U.S. Capitol Building to the left (north) of the Tunnel.  The window is circled in yellow in Figure 5 above.  At various moments, individuals, including one later identified as Mitchell Todd Gardner II, repeatedly struck the window with weapons and tools in an attempt to break the window and enter the Capitol from outside.  At one point, Bilyard stood next to and below an individual who struck the glass with a metal tomahawk, while encouraging him by shouting, "Window! Window! Break it!" and clapping.



Figure 8 (still image from open-source video footage contained in Exhibit 5 at 0:20)

Soon after, Bilyard stood next to and below Gardner while Gardner tried to break the

glass with a canister.



Figure 9 (still image from open-source video footage contained in Exhibit 6 at 0:27)

Bilyard then can be seen holding a small container of chemical irritant in his right hand. Bilyard appears to nod to a person below him who hands him a baseball bat.  He then turns and attempts to hand the bat to Gardner to assist breaching the window.



Figure 10 (still image from open-source video footage contained in Exhibit 6 at 0:36)

When Gardner refused to take the bat, Bilyard used the bat to strike the lower portion of the glass window in an attempt to breach the U.S. Capitol Building.



Figure 11 (still image from open-source video footage contained in Exhibit 7 at 0:15)

Moments later, Bilyard successfully shattered the lower glass portion of the window.  The FBI determined that the U.S. Capitol window that Bilyard struck led to Senate Terrace Mezzanine Room 2 ("Room ST-2M") inside the U.S. Capitol Building.  The cost to replace the window that Bilyard broke was $2,388.

Bilyard then turned to face the crowd and appeared to clap and shout in an apparent act of encouragement for people to start entering the U.S. Capitol Building through the window.  He and Gardner appear to yell, "it's open!"



Figure 12 (still image from open-source video footage contained in Exhibit 7 at 0:31)

Soon after, many people, led by Bilyard, entered the U.S. Capitol Building by crawling through the window that he had shattered.  *See* Ex. 6 at 1:40 – 2:00.  The entire incident can be seen on video captured by defendant Mariposa Castro.  *See* Ex. 8 at 0:00 – 0:45; *United States v. Castro*, 21-cr-299 (RBW).

Bilyard was inside the Capitol Building from approximately 4:16 p.m. through at least 4:32

p.m.  He took videos and pictures while inside.

 

Figures 13 and 14 (still images from Bilyard cell footage contained in Exhibit 9 at 0:02 and Exhibit 10 at 0:10)

 

Figure 15 *(still image from defendant Yvonne St. Cyr video footage contained in Exhibit 11 at 0:58)*     Figure 16 *(still image from defendant Annie Howell video footage contained in Exhibit 12 at 0:06)*

14

Other individuals who entered room ST-2M, after Bilyard broke its window, took items from that conference room that could be used as weapons, such as table legs and lamps. They passed the objects to people outside the broken window in order to aid the rioters who were assaulting law enforcement officers in the Tunnel.



Figure 17 (still image from open-source video found at https://www.youtube.com/watch?v=L3PjY1DGpVQ at 2:51)



Figure 18 (still image from open-source video found at https://www.youtube.com/watch?v=L3PjY1DGpVQ at 3:28)

**Bilyard's Statements after the Riot**

Bilyard showed no remorse for his crimes in the immediate aftermath of the riot.  On November 22, 2021, law enforcement officers executed a federal warrant to seize and search Bilyard's cell phone.  Among the images contained on the iPhone was a picture that his mother had taken and texted to him of an item that Bilyard left on the kitchen counter when he returned to North Carolina, with her message, "I would have rather had a t-shirt."



Figure 19 (text picture received on Bilyard's cell phone on January 7, 2021)

Bilyard responded by text on January 7, 2021, "Had to bring something back."  The canister shown in the message received by Bilyard is the same "Home Defense Pepper Gel" that Bilyard discharged towards law enforcement officers on January 6, 2021.  *See* Figure 4.

On August 4, 2021, FBI agents interviewed Bilyard at Lackland Air Force Base near San Antonio, Texas.  At the time, he was attending basic training for the United States Air Force (having signed up for the Air Force after participating in the January 6 riot), but subsequently

separated from the Air Force and moved back to his mother's home in Cary, North Carolina. Bilyard was somewhat defiant, at one point telling the interviewing agent that the agent was "going in circles" with his questions.  Bilyard admitted that he was on and around the U.S. Capitol Building grounds on January 6, 2021.  However, he falsely claimed that he only participated in lawful activities.  After Bilyard was shown portions of videos showing his participation in criminal acts and asked what he recalled about being at the U.S. Capitol Building on January 6, 2021, he terminated the interview, stating, "I think this is where I take my leave."

## THE CHARGES AND PLEA AGREEMENT

Bilyard was arrested in North Carolina on November 22, 2021.  On January 26, 2022, a federal grand jury returned an indictment charging Bilyard with nine crimes, including, (1) Civil Disorder, in violation of 18 U.S.C. § 231(a)(3); (2) Assaulting, Resisting, or Impeding Certain Officers Using a Deadly and Dangerous Weapon, in violation of 18 U.S.C. §§ 111(a)(1) and (b); (3) Entering and Remaining in a Restricted  Building or Grounds with a Deadly and Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(A); (4) Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly and Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(2) and (b)(1)(A); (5) Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly and Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(4) and (b)(1)(A); (6) Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); (7) Act of Physical Violence in the Capitol Grounds or Buildings, in violation of 40 U.S.C. § 5104(e)(2)(F); (8) Destruction of Government Property, in violation of 18 U.S.C. §§ 1361 and 2; and (9) Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).  On October 20, 2022, Bilyard pleaded guilty to Count Two,

Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of 18 U.S.C. §§ 111(a)(1) and (b).

## III.   STATUTORY PENALTIES

Bilyard now faces sentencing on Count Two, Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of 18 U.S.C. §§ 111(a)(1) and (b).   As recognized by the Plea Agreement and the Presentence Report issued by the U.S. Probation Office, Bilyard faces up to twenty years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100.

## IV.   THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The PSR correctly adopts the Offense Level Computation prepared by the parties in the Plea Agreement.  That Guidelines analysis follows:

| | |
|---|---|
| Base Offense Level: U.S.S.G. § 2A2.2(a)[3] | 14 |
| Use of a Dangerous Weapon: U.S.S.G. § 2A2.2(b)(2)(B) | +4 |
| Conviction for 18 USC §111(b): U.S.S.G. § 2A2.2(b)(7) | +2 |
| Official Victim: U.S.S.G. § 3A1.2(c)(1) | +6 |
| Adjusted Offense Level (Subtotal): | 26 |
| Acceptance of Responsibility: U.S.S.G. § 3E1.1(a) and (b) | -3 |
| Total Offense Level: | 23 |

---

[3] The cross-reference in U.S.S.G. § 2A2.4(c)(1) (Obstructing or Impeding Officers) directs that Section § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault.

PSR ¶¶ 32-43.  That is consistent with the Guidelines calculations stipulated to by the parties in the Plea Agreement.  ECF No. 38, ¶ 5.

Probation also determined that Bilyard's criminal history category was I, because he has no convictions.  PSR ¶¶ 44-46.  The Government does not dispute that determination. Accordingly, Bilyard's Guidelines imprisonment range is 46 to 57 months of imprisonment.  *Id.* at ¶ 75.  The defendant's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the range determined by Probation.  ECF No. 38, ¶ 5D.

## V.      SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

In this case, sentencing is guided by 18 U.S.C. § 3553(a).  As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.      Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Bilyard's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the Certification Vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis.  The nature and circumstances of Bilyard's offense were of the utmost seriousness, and fully support the Government's recommended sentence of 47 months of incarceration, three years of supervised release, and $3,500 in restitution.  Bilyard stood at the front of the mob on the LWT that already had forced the officers to retreat.  As others taunted and assaulted the officers with pepper spray and foreign objects, Bilyard lay in wait and then discharged pepper gel – a dangerous and incapacitating chemical – directly at the uniformed officers.  His conduct, with that of other rioters, caused the officers to retreat even further – into a tunnel entrance to the Capitol Building.  Bilyard followed the retreating officers and watched the

vicious assaults at the Tunnel, including the abduction and tasering of Officer Fanone. Bilyard then used a bat to break a window and crawl into the Capitol Building, leading the way for others. Some of the rioters who entered through the window broken by Bilyard ransacked the conference room and retrieved objects that were subsequently used to assault officers in the Tunnel.

The seriousness of this offense, including Bilyard's part in the retreat of the officers and continued assaults on them throughout the afternoon, and his central role in breaking into Room ST-2M of the Capitol Building, demands a sentence of imprisonment.

The Government's low-end Guidelines recommendation results in large part from Bilyard's cooperation and prompt acceptance of responsibility. Although he was not forthcoming before his indictment, Bilyard and his counsel met with the FBI for over two hours on October 11, 2022 pursuant to his plea agreement. Bilyard answered every question asked of him and appeared to speak candidly throughout. As a result of his interview, the FBI was able to confirm the identity of two previously uncharged individuals who committed serious offenses on January 6, 2021. The U.S. Attorney's Office then determined that it would prosecute those individuals and they have since been charged by criminal complaint and arrested.

**B.  The History and Characteristics of the Defendant**

The defendant was an 18-year-old student at the time of his criminal conduct. He has no other reported arrests or criminal convictions.

**C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Bilyard's crimes, particularly his conduct using pepper gel to incapacitate MPD officers and his breaking of a window into the Capitol Building, epitomize disrespect for the law.

20

When Bilyard entered the Capitol grounds, the Capitol Building itself, it was abundantly clear to him that lawmakers, and the law enforcement officers who tried to protect them, were under siege. Law enforcement officers were overwhelmed, outnumbered, and in some cases, in serious danger. The rule of law was not only disrespected; it was under attack that day.  A lesser sentence would suggest to the public, in general, and other rioters, specifically, that attempts to obstruct official proceedings and assaults on police officers are not taken seriously.  In this way, a lesser sentence could encourage further abuses.  *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

### D.    The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence of imprisonment is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B).  The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[4]  The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.  Bilyard eagerly participated in multiple crimes during the January 6 riot, spending hours at the front of the mob that assaulted and overwhelmed officers, damaged the Capitol Building, and unlawfully entered the Capitol and remained inside to obstruct the certification of the Electoral College vote.  Because he has no prior

---

[4] *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

criminal history, an unduly lenient sentence would send the message to Bilyard that such egregious conduct, within a civil disorder, will be tolerated by our justice system.

And, notwithstanding Bilyard's age, he is an adult who should be held responsible for the crimes that he knowingly and willfully committed.  As Judge Amy Berman Jackson explained when rejecting the defense that a January 6 defendant was less responsible than others:

> No one was swept away to the Capitol.  No one was carried.  The rioters were adults. This defendant, like hundreds of others, walked there on his own two feet and he bears responsibility for his own actions.  There may be others who bear greater responsibility and who must also be held accountable, but this is not their day in court; it's yours.

*United States v. Sorvisto*, 21-cr-320 (ABJ), Tr. 12/15/2021 at 20-21.

### E.  The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007).  As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'"  *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m).  In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up).  Accordingly, courts must give "respectful consideration to the Guidelines."  *Id*. at 101.

## F.        Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).  In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021).  Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity.  *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).  The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every

sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[5]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[6]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case:

---

[5] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, 22-cr-31 (FYP), (D.D.C. Aug. 26, 2022) Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[6] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available at https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

In *United States v. Mattice* and *Mault,* No. 21-cr-657 (BAH), Chief Judge Howell imposed identical sentences of 44 months' incarceration where the defendants, like Bilyard, discharged pepper spray at officers on the front lines at the West Plaza and in the Tunnel.  Mault and Mattice used pepper spray, rather than the more incapacitating pepper gel utilized by Bilyard.  Those defendants also did not damage Government property or unlawfully enter the Capitol Building.  But Mault and Mattice led the mob that penetrated the police line on the West Plaza, minimized and denied their unlawful conduct, did not cooperate with the Government, and failed to meaningfully accept responsibility for their wrongdoing until sentencing.  As both defendants had criminal history categories of I, their Guidelines ranges for convictions under 18 U.S.C. § 111(a)(1) were 37 to 46 months.

To date, Julian Khater has received one of the highest sentences of imprisonment for an individual convicted of assaulting officers on January 6, 2021.  *See United States v. Khater*, 21-cr-222 (RJL).  Khater discharged bear spray toward a line of at least three officers, at close range at the LWT at 2:23 p.m.  One of the officers that Khater sprayed was USCP Officer B.S., who later died.  Because Khater pleaded guilty to two counts of assaulting an officer using a dangerous weapon, and due to the bodily injuries resulting from his conduct, his Guideline range of imprisonment was 78 to 97 months.  The United States recommended a sentence of 90 months' incarceration, and Judge Hogan sentenced Khater to 80 months of imprisonment.

Another individual who pleaded guilty to assaulting officers using pepper spray was Daniel Ray Caldwell.  *See United States v. Caldwell*, 21-cr-181 (CKK).  Caldwell, like Bilyard, had a Criminal History Category of I and discharged pepper spray at officers who were protecting the Lower West Terrace Plaza.  Caldwell then entered the Capitol Building through the Senate Wing

Door and taunted officers within the Building.  Because Caldwell caused bodily injury to MPD officers, his Guidelines range was 63 to 78 months.  The United States recommended a mid-range sentence of 70 months of incarceration, and Judge Kollar-Kotelly sentenced Caldwell to 68 months of imprisonment.

The Court also may wish to consider *United States v. Palmer*, 21-cr-328 (TSC).  Palmer sprayed the contents of a fire extinguisher at police and threw multiple objects, including a wooden plank, a fire extinguisher (twice), scaffolding, and orange traffic barrier at officers in the Lower West Terrance.  Next, Palmer went to the Upper West Terrace, where he threw a pole at law enforcement officers.  *Id.* at 17-18.  Palmer made a false statement about his conduct post-plea on the internet, causing him to lose credit for acceptance of responsibility.  However, Palmer turned himself in to law enforcement, pleaded guilty relatively early, and voluntarily met with the FBI to provide truthful information.  The Government recommended, and the court imposed, a sentence of 63 months' incarceration, at the bottom end of the applicable Guideline range.

On March 16, 2023, Judge Mehta will conduct a hearing and impose a sentence for Mitchell Todd Gardner II, the individual to whom Bilyard attempted to hand a bat in Figure 10, above.  *See United States v. Gardner*, 21-cr-622 (APM).  Gardner pleaded guilty to felony counts of civil disorder, assaulting officers using a dangerous weapon, and obstruction of an official proceeding. The U.S. Probation Office determined that Gardner's total adjusted offense level was 23, Criminal History Category I – identical to Bilyard's – resulting in the same Guidelines range of 46 to 57 months' imprisonment.  However, Gardner's conduct was more aggravated that Bilyard's.  While at the Lower West Terrace tunnel, he encouraged rioters to assault police by repeatedly yelling, "pull the police out," "pull the cops out," and "grab their hands and pull them out."  Gardner also

used MPD-issued chemical spray canisters to assault officers in the Tunnel. Gardner then participated in the breach of the window in the Room ST-2M, entered the room, encouraged others to enter, and handed a broken piece of furniture outside for the item to be used as a weapon against the officers in the Tunnel. The Government therefore has requested a two-level upward departure under U.S.S.G. § 3A1.4 arguing that Gardner's conduct "involved, or was intended to promote, a federal crime of terrorism," as defined by 18 U.S.C. § 2332b(g)(5). The United States has recommended a sentence of 71 months of imprisonment, at the high end of the 57 to 71 month range that results from the departure.

When compared with the sentences imposed on Mault, Mattice, Khater, Caldwell, and Palmer, adopting the Government's recommendation here would not result in an unwarranted sentencing disparity.

## VI.    RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."[7] *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with

---

[7] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

recovering from bodily injury, 18 U.S.C. § 3663(b).  At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement."  *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here.  No victims claim or seek financial restitution from Bilyard for their physical injuries on January 6, 2021.  The parties agreed, however, as permitted under 18 U.S.C. § 3663(a)(3), that Bilyard must pay $2,000 in restitution to the Architect of the Capitol, which reflects in part the role Bilyard played in the riot on January 6, in addition to $1,500 in restitution for damage to the window of Room ST-2M, which Bilyard broke.[8]  ECF No. 38 at ¶ 13.  As the Plea Agreement reflects, the riot at the United States Capitol had caused "approximately $1,495,326.55" in damages, a figure based on loss estimates supplied by the Architect of the Capitol in mid-May 2021.  *Id.*  Bilyard's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol.  *See* PSR ¶ 93.

## VII.   CONCLUSION

For the reasons set forth above, the Government recommends that the Court impose a sentence of imprisonment of 47 months' incarceration, which is at the low end of the Guidelines range as calculated by the Probation Office and agreed upon by the parties in the Plea Agreement, three years of supervised release, restitution of $3,500, and the mandatory $100 special assessment.

---

[8] Unlike under the Sentencing Guidelines for which (as noted above) the Government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the Government or a governmental entity can be a "victim" for purposes of the VWPA.  *See United States v. Emor*, 850 F. Supp. 2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

Respectfully Submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
DC BAR NO. 481052

By:    */s/ Jordan A. Konig*
JORDAN A. KONIG
Supervisory Trial Attorney
U.S. Department of Justice Tax Division
Detailed to the U.S. Attorney's Office
For the District of Columbia
P.O. Box 55, Washington, D.C. 20044
202-305-7917 (v) / 202-514-5238 (f)
Jordan.A.Konig@usdoj.gov